IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

EASTGATE THEATRE INC., )
                                            )
                Plaintiff, )    TC-MD 130295C
                                            )
       v. )
                                            )
CLACKAMAS COUNTY ASSESSOR, )
                                            )
              Defendant. )    **FINAL DECISION**

        The court entered its Decision in the above-entitled matter on March 13, 2014. The court

did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days

after its Decision was entered. The court's Final Decision incorporates its Decision without

change.

        Plaintiff appeals the real market value of property identified as Account 01752348

(subject property) for the 2012-13 tax year. On October 8, 2013, a trial was held in the

courtroom of the Oregon Tax Court in Salem, Oregon. Christopher K. Robinson (Robinson),

Attorney at Law, appeared on behalf of Plaintiff; Ryan S. Prusse (Prusse), Oregon Certified

General Appraiser, MAI, testified for Plaintiff. Kathleen Rastetter, Assistant County Counsel,

appeared on behalf of Defendant. Ronald R. Saunders (Saunders), Oregon Registered Appraiser,

testified for Defendant. Plaintiff's Exhibits 1 and 2 and Defendant's Exhibits A to C were

received without objection.

/ / /

/ / /

/ / /

/ / /

## I. STATEMENT OF FACTS

The subject property is a single-tenant commercial multiplex cinema built in 1996-1997[1] and known as Oregon City Regal Hilltop 9 Theatre; it is situated within a larger commercial shopping center in Oregon City, Oregon. (Ptf's Ex 1 at 5, 29; Def's Ex A at 2, 37.) Because the subject property site (*i.e.*, land) is leased to Plaintiff, and is not part of this appeal, both parties valued only the subject property improvements and fixtures. (Ptf's Compl at 1; Def's Ex A at 2.) Plaintiff has occupied the property since construction and holds a long-term, triple-net lease with the land owner, Hilltop Mall LLC. (Ptf's Ex 1 at 20; Def's Ex A at 17.)

A.    *Subject property improvements*

The subject property construction is single-story concrete block with concrete foundation and floors and a flat built-up roof. (Ptf's Ex 1 at 5, 29; Def's Ex A at 12, 37.) The theatre structure contains 39,132 square feet of gross building space, split between 32,298 square feet on the main floor and 6,834 square feet on the mezzanine.[2] (Def's Ex A at 12.) With nine individual screens and a seating capacity of 1,851, the subject property offers 3-D films on four screens and 2-D films on the remaining five of its nine screens. (Ptf's Ex 1 at 5, 29; Def's Ex A at 12-13.) Most of the 1,851 cinema seats feature the older standard fixed style. (Ptf's Ex 1 at 5, 29; Def's Ex A at 12-13, 38.) In addition to the screens and seating area, the bottom floor contains a lobby and concession area with a covered main entrance, a manager's office, and two restrooms. (Ptf's Ex 1 at 5, 29; Def's Ex A at 12.) The mezzanine area holds a projection room

---

[1] Defendant states the subject property opened in 1996; Plaintiff maintains the property was built in 1997. (Ptf's Ex 1 at 29; Def's Ex A at 17, 37.) At trial, Prusse conceded that it may be possible the property was built in 1996.

[2] Prusse concluded the subject property contained 32,152 square feet of available space. (Ptf's Ex 1 at 5, 29, 54.) At trial, Prusse testified that he did not value the mezzanine because "the 'footprint area' is the primary measurement basis for a multiplex cinema primarily because the mezzanine tends to be very variable * * *." (*See* Ptf's Ex 1 at 2.) Saunders calculated the downstairs footprint area at 32,298 square feet. (Def's Ex A at 39.)

for each screen. (Ptf's Ex 1 at 5; Def's Ex A at 12-13, 38.) An adjacent parking lot offers 166-180 parking spaces. (Ptf's Ex 1 at 5; Def's Ex A at 12, 39.) The subject property and surrounding parking lots are well-lit with low-maintenance landscaping. (Def's Ex A at 39.) Both parties characterized the subject property as being in good condition. (*See* Ptf's Ex 1 at 5, 29; Def's Ex A at 13.) At trial, Prusse testified that the condition of the subject property is "very good." Finally, Saunders treated the seats as fixtures and included them in his opinion of value. (Def's Ex A at 13, 38.)

B.      *Subject property location and environs*

The subject property is a stand-alone facility located in the Hilltop Shopping Center in Oregon City, and is the only movie theatre (cinema) in Oregon City. (Ptf's Ex 1 at 17-18; Def's Ex A at 12, 24.) Oregon City is located 13 miles southeast of Portland. (Ptf's Ex 1 at 16; Def's Ex A at 24.) Although lacking direct access to Interstate-5, Oregon City is accessible by Highways 99E and 213, and by Interstate 205. (Ptf's Ex 1 at 15, 17-18; Def's Ex A at 24.)

The Hilltop Shopping Center was extensively remodeled in 2011 and contains a Safeway store and fuel station as well as several fast food restaurants, banks, and other convenience retailers. (Ptf's Ex 1 at 17-18; Def's Ex A at 31,37.) According to Saunders, the shopping center serves a population of almost 45,000 within a three mile radius in 2012 and is "a primary shopping district of Oregon City." (Def's Ex A at 24, 32.) Although there is limited exposure to the subject property from the main streets buttressing the shopping center, the center itself enjoys direct access to Beavercreek Road and Molalla Avenue, both five-lane roads. (Ptf's Ex 1 at 27; Def's Ex A at 33.)

The parties agreed there was a decline in attendance for the subject property in 2010 and 2011. (Ptf's Ex 1 at 36, 52; Def's Ex A at 38.) To explain that downward trend, Prusse noted in

his appraisal report that the "eight new screens in nearby Canby, Oregon[,] drew considerable revenues from [the subject property]." (Ptf's Ex 1 at 36.) In his appraisal, Saunders stated that declining attendance at the subject property during 2010 and 2011 is attributable to the "older dated appearance of the core portion of the shopping center[,]" as well as the subsequent remodel construction in 2011 and "secondary competition from the new 8-screen movie theatre in Canby * * *." (Def's Ex A at 38.) The city of Canby is located 13 miles southwest of the subject property. (*Id*. at 44.)

C.      *Highest and best use*

The parties agreed that the subject property would be considered a special use; both concluded that the subject property's highest and best use as improved is the present use, a nine-screen multiplex movie theatre. (Ptf's Ex 1 at 5, 29; Def's Ex A at 13, 44.)

D.      *Cost approach*

    1.      Plaintiff's cost analysis

        a.      Direct costs

At the time of his appraisal report, Prusse testified that he did not have access to the actual cost of construction for the subject property. (Ptf's Ex 1 at 45.) Prusse testified that a direct cost estimate using data obtained from the Marshall & Swift Valuation Service (Marshall Valuation Service), which "yields a direct cost of $134.35 per [square foot], or $4,319,622[,]" for the subject property. (*Id*. at 44.) Prusse stated in his appraisal report that this estimate excluded all indirect ("soft") costs. (*Id*. at 44, 85.)

In his appraisal report, Prusse provided a cost analysis for three cinemas, located in Canby, Madras, and Portland, Oregon. (*Id*. at 45.) The direct cost for the new eight-screen Canby cinema, built in 2008-09, was $104 per square foot, or $2,006,000 total, in 2008-09. (*Id*.)

That "figure excluded the city-owned parking lot improvements and all associated permits, fees, third-party reports, financing, and developer profit." (*Id.*) Prusse calculated in his appraisal report that the direct cost for the five-screen cinema in Madras, built in 2010-11, was $180.81 per square foot. (*Id.*) Prusse stated in his appraisal report that the Madras cinema had a city "development incentive" of $500,000. (*Id.*) Prusse reduced his per foot value estimate to between $125 to $135 after deducting "for site improvements and additions for elapse of time (inflation)." (*Id.*) The third cinema is a seven-screen theatre in the Portland metropolitan area constructed in 2007-08 for roughly $150 per square foot, inclusive of direct and indirect costs. (*Id.*) In evaluating the Portland area seven-screen cinema in his appraisal report, Prusse estimated an adjusted building-only value of $120-125 per square foot. (*Id.*) Prusse then made "a subjective three percent annual" time adjustment to the inclusive direct/indirect costs total to achieve a final per square foot value of $173.89 for the seven-screen Portland cinema. (*Id.*)

Based on those two cost approach methods, Prusse concluded in his appraisal report a direct cost for the subject property of $150 per square foot, which comes to $4,501,800. (*Id.* at 46.) Prusse then added $321,000 for site improvements, such as the paved parking lot and landscaping, for a total direct cost estimate for the subject property of $4,822,800. (*Id.*)

        b.     Plaintiff's indirect costs

Prusse next added indirect costs in his appraisal report, which he identified as including allowances necessary for construction such as architectural and engineering fees for plans and surveys, etc., appraisal, consulting, accounting, and legal fees, contract payments during construction, insurance and ad valorem taxes during construction, and marketing and developer administrative expenses. (*Id.* at 46.) Prusse stated in his report that "[i]ndirect costs typically average 10 to 30 percent of the direct cost of construction," but then noted that a "reasonable

conclusion" for the Portland metropolitan area is 10 to 20 percent for nonconstruction indirect "soft costs." (*Id*. at 46, 47.) Prusse concluded that 15 percent, or $723,420 total, is "reasonable" for his indirect costs analysis for the subject property. (*Id*. at 47.) At trial, Defendant provided evidence of an appraisal of the Canby cinema, completed by Prusse in April 2013, showing a 20 percent allocation to indirect costs. (*See* Def's Ex B at 49.)

Prusse combined his direct and indirect cost estimates for a total construction cost estimate of $5,546,220, or $172.50 per square foot. (Ptf's Ex 1 at 47.)

c.     Plaintiff's profit allowance, accrued depreciation, and fixtures

To account for profit allowance, or "entrepreneurial incentive," Prusse added an additional five percent of the total cost to construct, which he calculated to be $277,311. (*Id.*) Prusse stated in his report that "[g]enerally, this [entrepreneurial incentive] rate ranges from five to 20 percent of the cost to construct." (*Id*.) However, Prusse explained in his report that only a nominal five percent is warranted for the subject property because "[i]t is unlikely that the feasibility exists for speculative construction of a new multiplex cinema in the Oregon City market of the same/size and configuration." (*Id*.) Prusse agreed at trial that he allocated a 10 percent profit allowance to the Canby cinema. (*See* Def's Ex B at 49.)

Based on the foregoing, Prusse reported a "[t]otal replacement cost new * * * estimate[] [of] $5,823,531" before adjusting for depreciation and the value of the site. (Ptf's Ex 1 at 47-50.)

Prusse also adjusted his total cost estimate in his report for loss resulting from accrued depreciation, or the "loss in value from [] replacement cost of improvements that may emanate from physical deterioration, functional obsolescence, [or] external obsolescence * * *." (Ptf's Ex 1 at 48.) Prusse toured the subject building and found "no curable/minor or cosmetic deferred

maintenance," and therefore concluded there was no applicable curable depreciation in his cost approach. (*Id*.)

Prusse did make a 50 percent adjustment for incurable physical deterioration, which he described as "deterioration that cannot be practically or economically corrected at present." (*Id*.) Prusse calculated his 50 percent incurable "physical/economic depreciation" based on an assumed 15-year effective age for the improvements, and an "estimate[d] * * * life span of just 30 years." (*Id*.) (emphasis omitted).) In explaining the rationale for his 30-year life expectancy, Prusse noted in his report that multiplex cinema buildings with similar configuration, construction and use as the subject property "should typically realize physical lives exceeding 50 years." (*Id*.) However, according to Prusse:

> "[h]istory has shown that innovations and competitive improvements within the movie exhibition business(es) have effectively reduced the economic lives of in-place theatre structures. * * * [I]t is imprudent to expect a 50-year life cycle for in-place multiplex assets. We estimate that a life-span of just 30 years is most applicable for the special purpose improvements."

(*Id*.) (emphasis omitted).)

Prusse's 50 percent depreciation for incurable physical and economic deterioration, which, again, is based on a 30-year estimated life expectancy and a 15-year effective age for the subject property, yielded a negative depreciation adjustment of $2,911,766. (*Id*. at 48, 50.) Prusse did not find any functional or external obsolescence for the subject property "in addition to the appropriate physical/economic [previously] rendered * * *." (*Id*. at 50.)

Defendant provided evidence at trial that Prusse allocated a 50-year economic life for the Canby cinema and adjusted eight percent for depreciation. (*See* Def's Ex B at 50.) Prusse testified in response that with a new facility, like the one in Canby that has not yet been

/ / /

technologically replaced in the market, a 50-year economic life remains standard. Prusse testified that the Canby cinema will also begin to depreciate at a faster rate as it ages.

d.     Plaintiff's total cost approach

Prusse combined his direct cost of $4,822,800 to his indirect cost of $723,420, to produce his total construction cost of $5,546,220, to which he added a profit allowance of $277,311, for a total replacement cost new of $5,823,531. (Ptf's Ex 1 at 50.) Prusse reduced his $5,823,531 total replacement cost new by $2,911,766 to account for physical depreciation of 50 percent, for a depreciated replacement cost of $2,911,766. (*Id*.) Prusse then added an estimated bare land value of $1,800,000 to the $2,911,766 depreciated replacement cost, and arrived at a total estimated value under the cost approach of $4,711,766. (*Id*.) Prusse rounded that total to $4,710,000. (*Id*.)

2.     Defendant's cost analysis

a.     Direct costs

Saunders reported that the actual cost to construct the subject property in 1997 was $2,658,805. (Def's Ex A at 52.) Saunders applied a 1.7 percent upward adjustment in his report, based on Marshall Valuation Service recommendations, to account for the trended historical cost from the date of construction in 1997 to the January 1, 2012, assessment date. (*Id*.) Saunders reported that "the indicated cost to replace the subject property (improvements only) as of the date of valuation would be $4,519,969 or $115.51 per SF." (*Id*.)

Like Prusse, Saunders analyzed direct costs to construct the cinema in Canby. (*Id*.) According to Saunders, the Canby facility cost $2,006,000 to build in 2010; Saunders adjusted that cost by three percent each year to the date of assessment, with a total replacement cost conclusion of $2,128,165, or $110.26 per square foot. (*Id*.)

Saunders also presented a direct cost estimate in his report based on Marshall Valuation Service data, broken down into direct costs, indirect costs and developer's profit. (*Id*. at 51.) Saunders estimated a base cost of $92.35 per square foot for the main floor and $43.90 per square foot for the mezzanine floor. (*Id*.) After he adjusted for facilities additions (heating and cooling, and sprinkler systems), and factoring in height and size multipliers, Saunders reached an adjusted base cost of $112.84 and $46.71 per square foot of main and mezzanine floor space, respectively. (*Id*.) Finally, Saunders applied cost multipliers to adjust for current and local costs and site improvements, and concluded that the total direct replacement cost for the subject property was $4,501,993, or $115.05 per square foot (main floor and mezzanine). (*Id*. at 52.)

After he considered each of his estimates, $115.05 per square foot using Marshall Valuation Service, $115.51 per square foot under the trended historical cost approach, and $110.26 per square foot adjusted cost estimate for the smaller but comparable Canby cinema, Saunders determined that there is "good support" for a direct cost for the subject property improvements of $4,500,180, or $115 per square foot. (*Id*.)

        b.      Indirect costs

Saunders then estimated indirect cost for the subject property, which he defined in his report as "expenditures for items other than labor and materials that are necessary for construction," including items such as "real property taxes during construction, professional fees, permanent and construction financing fees, marketing and absorption costs paid during the lease-up period necessary to achieve stabilized occupancy, etc." (*Id*.) Saunders estimated indirect costs to be "15% of direct cost, for a total of $675,027." (*Id*.) Saunders reached a combined cost estimate for direct and indirect costs of $5,175,207, or $132.25 per square-foot. (*Id*. at 53.)

/ / /

c.       Profit allowance, accrued depreciation, and fixtures

In addition to direct and indirect costs, Saunders added a profit allowance of 10 percent of the estimated direct and indirect costs of $5,175,207 for entrepreneurial profit and overhead to account for developer risk, for a "total replacement cost new including developer's profit * * * [of] $5,692,728." (*Id*.)

Next, Saunders factored in the accrued depreciation for the subject property improvements. Saunders stated in his report that "[t]he subject property was in good condition at the date of valuation and did not suffer from any measurable deferred maintenance, functional obsolescence or external obsolescence." (*Id.*) Saunders concluded that the effective age of the subject property was 16 years on the applicable assessment date and the estimated economic life was "40 years according to Marshall Valuation Service depreciation tables (section 97, page 13)." (*Id.*) Saunders relied on the Marshall Valuation Service for accrued depreciation of the subject property, reported as 22 percent as of the date of assessment. (*Id.*) He applied the estimated depreciation of 22 percent to the estimated cost new of $5,692,728 and yielded a total accrued depreciation estimate of $1,252,400. (*Id.*) Saunders subtracted estimated accrued depreciation in the amount of $1,252,400 from the estimated cost new of $5,692,728 and yielded an estimated value under the cost approach of $4,440,328. (*Id.*)

Saunders valued the seats separately under his cost approach because the seats are classified as real property. (*Id*. at 54.) Using the Marshall Valuation Service, Saunders estimated the replacement cost new of the cinema seats to be $276,740. (*Id*.) Saunders noted in his report that there are "160 newer, high back seats and 1,691 standard seats," which he found to be in "good condition," having a remaining economic life of 80 percent, which resulted in a final indicated value for the seats of $221,392. (*Id*.)

d.      Total cost approach

After he added his direct costs of $4,500,180 to his indirect costs of $675,027, Saunders reached a combined cost estimate of $5,175,207.  (*Id*. at 53.)  Saunders added a profit allowance of $517,521, less accrued depreciation in the amount of $1,252,400, plus a seat replacement cost of $221,392, for a total value conclusion under the cost approach of $4,661,720.  (*Id*. at 53; *see id*. at 54.)

E.      *Sales comparison approach*

1.      Plaintiff's sales comparison approach

Prusse selected six sales comparisons from Oregon and Washington; they range south from Salem, Oregon, north to Renton, Washington.  (Ptf's Ex 1 at 67.)  Two of the comparables sold in 2011 and 2012, a third was a pending sale, and the other three were current listings.  (*Id*.)  Of the two sales, one was a seven-screen cinema in Salem, Oregon, (Comp 1) known as the Cinebarre Movieland 7, with 37,152 square feet of space, including a mezzanine, that sold on October 30, 2012, for an allocated price of $6,500,000.  (*Id*.)  The other sale was an eight-screen cinema in Vancouver, Washington, (Comp 2) with 36,427 square feet including a mezzanine, that sold on December 30, 2011, for $7,400,000.  (*Id*.)  Prusse stated in his report that Comp 2 was not actively listed prior to sale.  (*Id*.)  Both comparables were sold as leased fee and both offer restaurant-style amenities.  (*Id*.)  Prusse testified that Comp 1 is an allocated sale price because the theatre sold as a portion of the larger sale of the Salem Center Mall for approximately $44 million; the Cinebarre theatre is located within that mall.  At trial, Prusse testified that he discovered "a lot of mixed information about how much [of the sale] was allocable [to Comp 1]"; he ultimately determined the $6,500,000 sale price based on the net rent income Comp 1 was earning at the time of sale.

Prusse's three listings were built between 1975 and 1997, had net rentable areas ranging from 17,000 square feet to 74,306 square feet, the smaller of the three having four screens, the middle one having nine screens, and the largest having 13 screens. (*Id*.) Reported asking prices ranged from a low of $2 million to a high of $9.5 million. (*Id*.) Those theatres are located in Renton, Washington (Comp 4), Wilsonville, Oregon (Comp 5), and Corvallis, Oregon (Comp 6). (*Id*.)

Prusse noted in his report, and testified at trial, that the price per square foot for his comparable sales and listings ranged from a low of approximately $106 per square foot to a high of approximately $203 per square foot. (*Id*. at 72.) In his report, Prusse discussed location, revenue trends, market competition, and concluded that "the subject property's age/condition, unencumbered occupancy, income potential and location warrant a market value estimate between $125.00 and $175.00 per SF." (*Id*.) Prusse's report stated that "[w]e conclude a mid-range overall price per SF of $150.00 for the subject property." (*Id*.) Prusse testified at trial that his $150 per square foot qualitative value estimate was "ballparked."

Prusse also applied quantitative adjustments to his sales analysis. (*Id*. at 72-77.) Prusse testified that various adjustments to the different comparables for factors such as property rights, marketing, site value, and building size resulted in an "adjusted array" of between approximately $115 per square foot and $165 per square foot, and that the average was $135.78 per square foot. His report reflected similar numbers. (*Id*. at 76.)

Prusse focused on the two verified completed sales transactions and made 10 percent downward adjustments to Comps 1 and 2 for age/condition and 10 percent for functional differences, for a total 20 percent downward adjustment. (*Id*.) The calculated price per square foot for Plaintiff's Comps 1 and 2 are $174.96 and $203.15, respectively. (*Id*.) After he applied

the 20 percent adjustment to Comps 1 and 2, Prusse calculated an adjusted price per square foot of $139.97 for Comp 1, and $162.52 for Comp 2. (*Id.*) Prusse noted that "[Comp] 1 [is a] transaction[] from [a] distant and differing market area[]; with living style improvements in place." (*Id.* at 76-77.) Prusse reported that "the narrowed range of the remaining adjusted transactions/listings is about $130.00 to $165.00 per SF, after adjustments for location, age differences, functional features and potential income." (*Id.* at 77.) Prusse's "narrowed range" excluded "low-ends," which appear to be Comps 4 and 6, both of which are listings. (*Id.* at 76-77.) Prusse concluded in his report that "the subject property's location, income potential and condition warrant a mid-range retrospective market value conclusion of $140.00." (*Id.* at 77.) (emphasis omitted).) He applied that figure to a gross building area of 32,152 square feet and arrived at a rounded market value of $4,500,000. (*Id.*)

Prusse concluded by noting in his report that a retrospective market value estimate for the subject property under the sales comparison approach, based on a value estimate of $4,820,000 using qualitative adjustments and a value estimate of $4,500,000 using quantitative adjustments, was $4,500,000. (*Id.*) Prusse placed greater weight on the quantitative analysis. (*Id.*)

2.      Defendant's sales comparison approach

Saunders considered but did not apply a sales comparison approach. (Def's Ex A at 45, 55, 57.) He explained in his report that "[t]here have been no comparable sales of similar arms-length multi-screen theatre properties during the last three years in the Portland metropolitan area." (*Id.* at 45.) Later in his brief, one page discussion of the sales comparison approach, Saunders stated that the sales comparison approach is less than ideal because it "cannot be applied with any degree of accuracy based upon the available sales data * * *." (Def's Ex A at 55.) Saunders did briefly discuss five sales in his report, the first four selling

between May 2010 and February 2013 for prices ranging from a low of $387,000 for an older, smaller, single screen theatre in The Dalles to a high of $10,100,000 (price allocation) for the Cinebarre theatre in Salem that Plaintiff used as its Comp 1. (*Id.*) The other two theatres sold for $7,400,000 (Comp 2) and $8 million (Comp 4). Saunders' Comp 2 was the Cinetopia restaurant and theatre in Vancouver, Washington, that Plaintiff also used as its Comp 2. Saunders candidly noted that his fifth sale was "not comparable due to time of sale, age, design and size and the fact that the purchase price was allocated between the two properties [a single screen theatre and a bar] by the broker." (*Id.*) Saunders concluded by advising that "[t]he reader should note that the subject property being valued includes improvements only and all of the sales referred to above include both land and improvements which also makes comparison difficult." (*Id.*) In the final analysis, Saunders wholly rejected any attempt at valuing the subject property under the sales comparison approach. (*Id*. at 57.)

F.      *Income capitalization approach*

        1.      Plaintiff's income approach

                a.      Subject property's economic performance

Prusse reviewed three years of revenue stream for the subject property to determine an income analysis using prior economic performance. (Ptf's Ex 1 at 51.) Prusse noted that gross revenue had declined from 2009, and although it was projected to increase in the future, he did not anticipate it reaching 2009 income levels. (Ptf's Ex 1 at 52.) Combined gross income was $2,158,665, $1,693,123, and $1,832,044 for 2009, 2010, and 2011, respectively. Prusse broke out revenue into three categories: gross revenue from ticket sales, concessions, and other income. (*Id.*) Prusse placed little weight on the least profitable year and, instead, assumed an "achievable gross revenue of $1,900,000 and a mid-range 15 percent lease rate basis, [and

concludes that] the indicated affordable lease payment for the current operation is $285,000 per year." (*Id*.) Using that information and assumptions, Prusse calculated a value of $8.86 per square foot and $31,667 per screen. (*Id*.)

b.      Market lease data

Prusse identified six lease comparables located in Salem, Milwaukie (Oregon), Beaverton, Tigard, and Portland. (Ptf's Ex 1 at 54, 59.) The lease comparables varied from one to 11 screens and range in size from 7,500 to 53,195 square feet. (*Id*.) The subject property known as Oregon City Regal Hilltop 9 Theatre in Oregon City had nine screens and was approximately 32,000 square feet in size (excluding the mezzanine). (*Id*. at 54; Def's Ex A at 12.) The comparables vary in age, style, type of location, lease terms (lease rates, length of lease, and potential annual increases), and quality class. (Ptf's Ex 1 at 54.) Prusse calculated lease rates from $5.27 to $18 per square foot, with an average of $11.68, and rents per screen ranging from $24,613 to $87,046 per screen, with an average rate of $53,566 per screen. (*Id*. at 54, 59-60.)

Relying more on the past economic performance of the subject property, Prusse concluded a gross potential income of $385,824, which Prusse reported as equating to $12 per square foot and $42,869 per screen, inclusive of interior build-out and parking lot. (*Id* at 60-61.)

c.      Vacancy and collection loss and operating expenses

Prusse stated that he expected continuous occupancy of the subject property "until at least the end of the initial lease term," and added a vacancy and collection loss of two percent; he calculated an effective gross income of $378,108. (*Id*. at 61.) Prusse's "lease term" was an assumed or estimated figure because, as Prusse noted in his report, "[t]he subject property is not leased in whole; but rather the ground lessee has constructed and operates the [subject property]

multiplex [theatre], since opening for business in 1997." (*Id*. at 51, 54.)  Prusse assumed a 10-year minimum stepped-up lease if the property were to be leased as opposed to owner-occupied and operated.  (*Id*. at 54.)

Prusse estimated the subject property's operating expenses at $15,124 per year, which included two percent for management and two percent for reserves for capital replacements. (*Id*. at 61-62.)  Prusse did not estimate any maintenance or repair expenses and explained that the building was "recently constructed, [and therefore] few if any repairs are anticipated for many years." (*Id*. at 62.)  As explained earlier in this Decision, the subject property was built in 1996-1997, but is located in the Hilltop Shopping Center, which "was extensively remodeled in 2011." (Def's Ex A at 37.)

Based upon his income and deductions estimates, Prusse calculated a net operating income of $362,983, or $11.50 per square foot, for the subject property.  (Ptf's Ex 1 at 62.)

d.      Direct capitalization

Using the market data gleaned from Plaintiff's sales comparables, which demonstrated a rate range of 5.5 to 8.46 percent and an average of 7.42 percent, Prusse settled upon an overall capitalization rate of eight percent for the subject property.  (Ptf's Ex 1 at 63-64.)  After he applied that capitalization rate to his projected net operating income of $362,983 which produced a stabilized market value indication of $4,537,290, Prusse concluded the retrospective market value as of the date of assessment was $4,540,000 (rounded) under the income approach.  (*Id*. at 64-65.)

2.      Defendant's income approach

Saunders undertook an income approach analysis but ultimately rejected the data collected, and cautioned that "the income approach cannot be applied with any degree of

accuracy based upon the available data * * * at or near the date of valuation." (Def's Ex A at 56.)

G.    *Final value conclusions and tax and assessment data*

After he placed the least emphasis on the sales comparison approach and the most on the income approach, Prusse determined a final overall real market value conclusion of $4,600,000, including building, improvements, and land. (Ptf's Ex 1 at 2-3, 79.) Prusse then deducted his land value estimate of $1,800,000 for an improvement-only residual value of $2,800,000. (*Id*. at 3, 79.)

After he determined the sales comparison and income approaches could not be used, Saunders relied exclusively on his cost approach of $4,661,720 for his final value conclusion. (Def's Ex A at 57.) Saunders' real market value estimate was an opinion of value of the fee simple interest of the improvements and fixtures only. (*Id*. at 3.) Saunders did not value the land because "[t]he site is leased on a long-term basis and is [therefore] not part of this appeal." (*Id*. at 2.) Again, Saunders' value estimate was comprised of an improvement value of $4,440,328 and an additional $221,392 allocated to fixtures (the movie theatre seats). (*Id*. at 3.)

The real market value on the assessment and tax rolls for the subject property for 2012-13 is $4,202,710. (Ptf's Compl at 2.) The maximum assessed value and assessed value are both $4,024,796. (*Id*.) The Clackamas County Board of Property Tax Appeals sustained each of those values. (*Id*.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor (Richardson)*, TC-MD No

020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). ORS 308.205(1) defines real market value as:[3]

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

For the 2012-13 tax year, the assessment date was January 1, 2012. ORS 308.007; ORS 308.210.

Because Plaintiff is the party seeking affirmative relief in this appeal, it has the burden of proof and must therefore prove, by a preponderance, or the greater weight, of the evidence, that there is an error in the real market value appearing on the assessment and tax rolls. ORS 305.427; *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). Moreover, a taxpayer cannot sustain its burden of proof merely through noting errors in the county's position, but must instead "provide competent evidence of the [real market value] of [the subject] property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). Moreover, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

There are three separate approaches to valuation – cost approach, sales comparison approach, and income approach – that are to be considered in valuing a property. *Allen v. Dept of Rev.*, 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2). Although each approach must be reviewed, the court may determine that all three cannot be reasonably applied to the subject property's valuation. OAR 150-308.205-(A)(2)(a). The selection of the appropriate valuation approach is a question of fact "to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

A.      *Disputed subject property facts*

Very few of the facts are in dispute. However, a few discrepancies remain, which, for the sake of clarity, the court must resolve at the outset.

First, the parties disagreed as to the year of construction; Prusse stated in his appraisal that the subject property was built in 1997, while Saunders maintained that the cinema was built and operational in 1996. Prusse testified at trial that it was possible the subject property was of 1996 vintage. The court finds the subject property was built in 1996.

Additionally, the parties calculated differing space for the subject property. Saunders stated in his appraisal that the subject property is 39,132 square feet, with 6,834 of that allocated to the mezzanine area; thus, by Saunders' calculations, the main floor area is 32,298 square feet. Prusse stated the cinema has a footprint of 32,152 square feet; in calculating a footprint area, Prusse excluded the mezzanine area from his appraisal. Prusse testified at trial that "the 'footprint area' is the primary measurement basis for a multiplex cinema * * *." Prusse did not provide any tangible evidence to support his claim that no value should be attributable to 6,800 square-foot area of usable space, at least part of which is being used. As a result, the court agrees with Saunders that the mezzanine area should be included in the area being valued, and

should be given some value. The court finds the total space for the subject property to be as stated by Saunders.

B.      *The parties' value approaches*

Plaintiff valued the subject property using all three standard approaches to value. Plaintiff employed two methodologies in estimating current direct costs for the cost approach; cost data from Marshall Valuation Service and "escalated historic costs" derived from information Prusse reportedly obtained from local commercial construction consultants. Prusse's cost estimate using Marshall Valuation Service was $4,319,622, or $134.35 per square foot. Prusse did not explain that figure and provided only minimal supporting documentation in his addenda. (Ptf's Ex 1 at 85.) That estimate excluded site improvements, which Prusse estimated to be $321,000 ("lump sum") under his second cost valuation approach. Adding Prusse's site improvements to his $4,319,622 cost under Marshall Valuation Service results in a direct cost estimate of $4,640,622.

Plaintiff's second direct cost approach is based on an estimate of the cost of constructing a comparable multiplex cinema derived from the costs associated with constructing three other cinemas; one in the Portland metropolitan area, another in Canby, and the third in Madras, Oregon. Construction costs from those theatres ranged from approximately $104 per square foot to $181 per square foot.

Prusse compared the two approaches and concluded that the total replacement cost new was $5,823,531, less physical depreciation of 50 percent, for a final depreciated replacement cost new of $2,911,766. That figure is based on direct costs of $4,822,800, plus $321,000 for site improvements, an additional $723,420 (15 percent of direct costs) for indirect costs such as

/ / /

architectural fees, engineering, appraisals, insurance and taxes during construction, and debt service, plus five percent, or $277,311 for entrepreneurial incentive.

Plaintiff also estimated the value of the subject property under the income and sales comparison approaches, arriving at respective value estimates of $4,540,000 (rounded) under the income capitalization approach and $4,500,000 under the sales comparison approach.

Defendant explored all three approaches to value, but ultimately relied solely on the cost approach because there was a lack of reliable market data for either the sales comparison or income approaches. Defendant's appraiser Saunders used essentially three methodologies for his cost approach: Marshall Valuation Service, trended actual costs for the subject property, and a cost estimate derived from comparison to the nearby eight-screen cinema in Canby, Oregon.

Saunders first utilized those three approaches to estimate the direct costs, which he ultimately concluded were $4,500,180. Direct costs under Marshall Valuation Service were $4,501,993, and are based on an adjusted base cost of $112.84 per square foot for the 32,298 square feet of main (first) floor theatre and $46.71 for the 6,834 square-foot mezzanine. After he applied local cost modifiers and added $50,000 for site improvements, Saunders arrived at his $4,501,993 direct cost estimate, which equates to $115.05 per square foot. Saunders also trended reported actual construction costs for the subject property of $2,658,805 by 1.7 percent to account for the time span between the date of construction in 1996 to the January 1, 2012, assessment date. That trend generated a direct cost estimate of $4,519,969, or $115.51 per square foot. Finally, Saunders analyzed the cost of the Canby Cinema and, applying a two-year market (time) trend of three percent per year, arrived at a per square foot cost (direct) of $110.26. As indicated above, Saunders ultimately concluded that the direct costs for constructing the subject property as of the applicable assessment date would be $4,500,180.

Saunders adjusted his direct cost estimate upwards by 15 percent for indirect costs such as property taxes during construction, professional fees, marketing, etc. The 15 percent indirect cost added $675,027 to the $4,500,180 direct costs. The total of those two numbers is $5,175,207, or $132.25 per square foot. Saunders then added 10 percent ($517,521) for entrepreneurial profit and overhead, which resulted in a total replacement cost new including profit of $5,692,728. Finally, Saunders estimated accrued depreciation to be 22 percent based on an effective age of 16 years and a 40-year life expectancy, which came to estimated accrued depreciation of $1,252,400. Subtracting that figure from his $5,692,728 replacement cost new resulted in a value indication under the cost approach of $4,440,328.

C. *Court's analysis*

Plaintiff presented a value estimate derived from all three approaches to value, although Plaintiff relied primarily on the cost approach. Plaintiff's appraisal report stated "significant supportive weight" was given to the cost approach, "supportive weight" to the income capitalization approach, and, "due to the very limited array of comparable improved sales available," Plaintiff gave "only supportive weight" to the sales comparison approach. (Ptf's Ex 1 at 78-79.) Defendant explored all three approaches to value, but ultimately concluded that neither the sales comparison approach nor the income approach could "be applied with any degree of accuracy based upon the available" data. (Def's Ex A at 55-57.)

The court has concerns with Plaintiff's final value estimate. Plaintiff relied primarily on the cost approach for a property that was built in 1996. The cost approach is best suited for newer properties. *Magno v. Dept. of Rev.* (*Magno*), 19 OTR 51, 55 (2006) (citation omitted). This case presents a prime example of why the cost approach has limited utility for older

properties. In order to arrive at a value estimate for the January 1, 2012, assessment date, Plaintiff applied 50 percent depreciation; Defendant estimated depreciation to be only 22 percent. Although the property is approximately 16 years old, the parties agreed that the theatre is in good or very good condition and was part of an extensive renovation completed in 2011. Plaintiff's depreciation rate of 50 percent therefore strikes the court as unreasonably high. Whereas both parties started with very similar figures for total replacement cost new – Plaintiff used $5,823,531 and Defendant $5,692,728 – Plaintiff ended up with a value estimate of $2,911,766 versus Defendant's estimate of $4,440,328. Applying Defendant's 22 percent depreciation rate to Plaintiff's total replacement cost new results in a final cost estimate of $4,542,354. The current real market value on the assessment and tax rolls as of January 1, 2012, is $4,202,710. The age of the subject property simply makes the cost approach unreliable because of the many assumptions and variables required, including depreciation. The court, therefore, finds a valuation estimate based on that approach unpersuasive.

Additionally, Plaintiff arrived at value estimates under both income capitalization approach and the sales comparison approach of $4,540,000 (rounded) and $4,500,000 (rounded), respectively. Those value estimates are both above the current real market value on the assessment and tax rolls.

Thus, although the court has the statutory authority under ORS 305.412 to determine the real market value of a property irrespective of the values pleaded by the parties, the evidence in this case is simply insufficient for the court to determine a value.

### III. CONCLUSION

After careful consideration, the court finds Plaintiff failed to meet its burden of proof in establishing an error in the real market value of the subject property as of January 1, 2012.

Moreover, there is insufficient evidence for the court to determine the real market value on the basis of the evidence before it.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied and that the current real market value on the assessment and tax rolls of $4,202,710 for the property identified as Account 01752348, for the 2012-13 tax year, is sustained.

Dated this ___ day of March 2014.

_____
DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on March 31, 2014.  The court filed and entered this document on March 31, 2014.*